J-A25039-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.J.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 937 EDA 2017 |

Appeal from the Order Entered February 23, 2017
in the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0001260-2016,
CP-51-DP-0001846-2016

BEFORE: OTT, J., STABILE, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.: **FILED DECEMBER 05, 2017**

Appellant, S.G. ("Mother"), files this appeal from the decree dated and entered February 23, 2017, in the Philadelphia County Court of Common Pleas, granting the petition of the Department of Human Services ("DHS") and involuntarily terminating her parental rights to her minor, dependent son, J.J.B. ("Child"), born in July 2016, pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1, 2] Mother further appeals the

_____

* Former Justice specially assigned to the Superior Court.

[1] By separate decree the same date, the trial court involuntarily terminated the parental rights of putative father, J.B., Jr. ("Father"), with respect to Child. An appeal has not been filed by Father, nor is Father a party to the instant appeal.

[2] While the trial court incorporates Section 2511(a)(8) in its decree terminating Mother's parental rights, Decree of Involuntary Termination of
*(Footnote Continued Next Page)*

order dated and entered February 23, 2017, changing Child's permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351. After review, we affirm the trial court's decree and order.

The trial court summarized the relevant procedural and factual history as follows:

> On August 22, 2016, the Department of Human Services (DHS) received a Child Protective Services (CPS) report alleging J.J.B. sustained three skull fractures and the cause of the fractures was unexplained. The report stated J.J.B. suffered two skull fractures on the right side of his head and one skull fracture on the left side of his head. The report indicated J.J.B. had been in the care of his father from August 18, 2016 until August 20, 2016. Father returned J.J.B. to the care of his mother on August 20, 2016. The report stated Mother observed that J.J.B. was suffering from a small lump on his head. The report stated the lump began to enlarge and Mother took J.J.B.[] to his primary care physician. J.J.B.'s primary care physician sent him to St. Christopher['s] Hospital for Children [E]mergency [R]oom for an examination. The report alleged that Father was unable to explain how J.J.B. had been injured. J.J.B. was admitted to the hospital for a full physical examination. The report was indicated.
>
> On August 24, 2016, DHS visited J.J.B. at St. Christopher's Hospital for Children. DHS learned that a skeletal scan and a magnetic resonance imaging (MRI) scan had revealed that J.J.B. had not sustained any other injuries. DHS learned Mother spent the night of [] August 23, 2016 in J.J.B.['s] hospital room. The report indicated hospital staff had concerns about Mother's ability to care for J.J.B. because Mother failed to wake up and feed and change J.J.B. when he cried. The report stated Mother called a nurse to finish feeding J.J.B. because Mother wanted to leave the hospital room for food for herself.

*(Footnote Continued)* ───────────────

Parental Rights, 2/23/17, the petition filed by DHS did not include this subsection. Petition for Involuntary Termination of Parental Rights, 12/22/16.

On August 24, 2016, DHS spoke with Mother, who stated that J.J.B. had been in the care of Father from August 18, 2016 until August 20, 2016. Mother stated when J.J.B. was returned to her care, he was exhausted, had two marks on the bridge of his nose and bruising around his eyes. Mother observed a small lump on the back of his head. Mother stated the lump on the back of J.J.B.'s head did not concern her because he had been born with a similar lump on his head.

Mother stated on August 22, 2016, she attended a post-natal appointment at her primary care physician's office, and left J.J.B. in the care of Maternal Aunt. Mother stated she received a phone call from Maternal Aunt stating J.J.B.'s head was swollen and telling her to return to Maternal Aunt's home to take J.J.B. to the hospital. Mother retrieved J.J.B. from Maternal Aunt's home and took him to his primary physician who instructed her to take J.J.B. to the emergency room.[3] Mother subsequently took J.J.B. to the St. Christopher's Hospital for Children [E]mergency [R]oom, where J.J.B. was admitted.

DHS later learned that St. Christopher's Hospital for Children staff members had not noted any facial bruising or marks between J.J.B.'s eyes upon his admittance to the hospital.

On August 24, 2016, DHS visited the home of Maternal Aunt, where Mother, J.J.B. and J.J.B.'s adult Maternal Uncles and Aunt resided. J.J.B.'s Maternal Uncles and Aunt confirmed the sequence of events that led to J.J.B.['s] hospitalization.

On August 25, 2016, DHS learned that J.J.B. was ready to be discharged from St. Christopher's Hospital [for] Children.

On August 25, 2016, DHS obtained an Order of Protective Custody (OPC) for J.J.B. and went to St. Christopher's Hospital for Children to place him. Father was present at the hospital, and refused to allow DHS to take custody of J.J.B. After Father was restrained by hospital security, DHS took custody of J.J.B. and placed him in a Concilio foster home.

---

[3] There is some disparity in the record between Maternal Aunt and Maternal Grandmother. We do not, however, find this distinction significant to our consideration.

On August 26, 2016, a Shelter Care Hearing was held for J.J.B.[] [T]he Honorable Lyris F. Younge lifted the OPC, ordered the temporary commitment to DHS to stand and suspended visits for Mother and Father until further order of the [c]ourt.

On September 15, 2016, and Adjudicatory Hearing for J.J.B. was held before Judge Younge who ordered that the temporary commitment to DHS stand. The visits of Mother and Father remained suspended pending the outcome of further investigation by DHS.

On September 27, 2016, an Adjudicatory Hearing for J.J.B. was held before the Honorable Vincent Furlong, w[ho] continued the case and ordered that the order regarding suspension of the visits of Mother and Father stand.

On October 7, 2016, an Adjudicatory Hearing for J.J.B. was held before Judge Vincent Furlong, who further deferred dependent adjudication and ordered that the temporary commitment to DHS stand.

On November 17, 2016, J.J.B.['s] temporary commitment to DHS was ordered to stand. Adjudication was further deferred; the case was continued for further testimony by Dr. Maria McColgan, the director of the Child Protection Program at St. Christopher's Hospital for Children[,] as to J.J.B.['s] injuries.

On November 28, 2016, an Adjudicatory Hearing for J.J.B. was held before Honorable Lyris F. Younge, who discharged the temporary commitment to DHS, [and] adjudicated J.J.B. dependent, committing him to DHS.

On November 28, 2016, Judge Younge found that aggravated circumstances existed as to both Mother and Father in that J.J.B. had been the victim of physical abuse resulting in serious bodily harm by a parent and ordered that no further efforts be made to preserve the family and reunify J.J.B. with his parents. Judge Younge ordered that Voluntary Relinquishment of Parental Rights petitions be offered to Mother and Father.

On December 19, 2016, DHS learned Mother and Father refused to sign Voluntary Relinquishment of Parental Rights petitions.

J.J.B. had been in foster care since his discharge from St. Christopher's [Hospital for Children] on August 25, 2016.

- 4 -

Trial Court Opinion ("T.C.O."), 6/7/17, at 1-3.

DHS filed petitions for involuntary termination of parental rights and for a goal change to adoption on December 22, 2016. The trial court held a combined termination/goal change hearing on February 23, 2017.[4] In support thereof, DHS presented the testimony of Northeast Treatment Centers (NET) Community Umbrella Agency (CUA) case manager, Telita Thomas.[5] Additionally, Mother, represented by counsel,[6] testified on her own behalf.[7]

_____

[4] Mother incorrectly suggests in her brief that the goal change/termination hearing commenced on November 28, 2016. Mother's Brief at 6 (unpaginated). However, on November 28, 2016, the court conducted an adjudicatory/aggravated circumstances hearing. *See* DHS Exhibit 1.

[5] Counsel stipulated that the case manager would testify as to the statement of facts presented in DHS's petition for involuntary termination, but did not stipulate as to the veracity of the statement of facts. Notes of Testimony ("N.T."), 2/23/17, at 11. DHS further presented DHS Exhibits 1 and 2. *Id.* at 54. While the on the record exchange suggests that DHS Exhibit 2 includes DHS Exhibit 3 from the adjudicatory/aggravated circumstances hearing on November 28, 2016, *id.* at 10-11, DHS Exhibit 2 as contained in the certified record does not include this exhibit from the prior hearing. Nonetheless, we observe that the dependency record does contain DHS Exhibit 3 from the adjudicatory/aggravated circumstances hearing.

[6] Mother, previously represented by appointed counsel, was represented by private counsel at the termination/goal change hearing and in the instant appeal. N.T. at 6. By way of further background, we note that Mother was represented by different private counsel in the dependency matter prior to appointment of counsel. *See* DHS Exhibit 1.

[7] Mother, through counsel, additionally attempted to offer the testimony of medical witnesses, as well as Maternal Grandmother, as to Child's physical state before and after his time in Father's care from August 18 to August 20,
*(Footnote Continued Next Page)*

By decree and order dated and entered February 23, 2017, the trial court involuntarily terminated the parental rights of Mother pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), and changed the permanency goal to adoption. On March 17, 2017, Mother, through counsel, filed a notice of appeal. Mother thereafter filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) on March 23, 2017.[8]

_(Footnote Continued)_ ─────────────────

2016. N.T. at 29, 41. Mother, however, abandoned the medical witnesses, _id._ at 33-34, and the testimony of Maternal Grandmother was excluded by the court, even after Mother then attempted to narrow it to lack of DHS involvement with the home. _Id._ at 42-43. The court recognized that the issue of Child's injuries and abuse were already dealt with in the course of the adjudicatory/aggravated circumstances hearing. _Id._ at 31-33, 42-43. Moreover, regardless of any prior involvement or lack thereof, DHS was now involved with Child. _Id._ at 43. Notably, Mother's own testimony was limited to the extent she attempted to testify as to Child's injuries and abuse. _Id._ at 37-39.

[8] In children's fast track matters, such as this matter, a concise statement of errors complained of on appeal is required to be submitted with the notice of appeal. Pa.R.A.P. 1925(a)(2)(i). However, as Mother filed a statement just under one week after the notice of appeal and still within the thirty-day appeal period, and there is no claim of prejudice as a result, we do not penalize her. **See In re K.T.E.L.**, 983 A.2d 745 (Pa.Super. 2009) (failure to file 1925(b) statement concurrently with children's fast track appeal results in defective notice of appeal, which undergoes not _per se_ quashal or dismissal but, instead, case-by-case disposition since failure to file violates procedural rule rather than trial court order); **Cf. Mudge v. Mudge**, 6 A.3d 1031 (Pa.Super. 2011) and **J.M.R. v. J.M.**, 1 A.3d 902 (Pa.Super. 2010) (failure to file a Rule 1925(b) statement of errors complained of on appeal, when ordered by the Superior Court, will result in a waiver of all issues on appeal).

At the outset, we note that, in their briefs submitted with regard to the instant appeal, DHS, as well as counsel for Child, argue that Mother waived all issues on appeal and/or Mother's appeal should be dismissed. DHS's Brief at 9-10; Child's Brief at 14-16. DHS argues that Mother has waived all issues on appeal as she failed to include a statement of questions involved in her brief resulting "in an insufficient brief that has deprived counsel of the opportunity to prepare a meaningful response to her argument and to allow the [c]ourt to conduct a meaningful review of her claim." DHS's Brief at 9. DHS further maintains that Mother failed to raise the issue asserted in her brief, the fact that she had nothing to do child's injuries and/or abuse, in her concise statement. *Id*.

Similarly, counsel for Child argues that Mother abandoned the issue raised in her concise statement related to presentation of medical witnesses by failing to argue it in her brief. Child's Brief at 16. In addition, counsel for Child contends that Mother failed to challenge the termination of parental rights before the trial court, instead attempting to contest her responsibility for the abuse of Child. *Id.* at 15. Counsel for Child asserts the following:

> Because [Mother] failed to present evidence or argument challenging the termination of parental rights, this issue is waived. Furthermore, [Mother] did not make appropriate reference to any place in the record where she presented evidence or argument relevant to challenging the termination of parental rights. As such, she waived any claim regarding the termination of her parental rights.

*Id*. (citations omitted).

Pursuant to Pennsylvania Rule of Appellate Procedure 2111:

**(a)      General rule.-**The brief of the appellant, except as otherwise prescribed by these rules, shall consist of the following matters, separately and distinctly entitled and in the following order:

(1)      Statement of jurisdiction.
(2)      Order or other determination in question.
(3)      Statement of both the scope of review and the standard of review.
(4)      Statement of the questions involved.
(5)      Statement of the case.
(6)      Summary of argument.
(7)      Statement of the reasons to allow an appeal to challenge the discretionary aspects of a sentence, if applicable.
(8)      Argument for appellant.
(9)      A short conclusion stating the precise relief sought.
(10)      The opinions and pleadings specified in Subdivisions (b) and (c) of this rule.
(11)      In the Superior Court, a copy of the statement of errors complained of on appeal, filed with the trial court pursuant to Rule 1925(b), or an averment that no order requiring a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) was entered.

**(b)      Opinions below.-**There shall be appended to the brief a copy of any opinions delivered by any court or other government unit below relating to the order or other determination under review, if pertinent to the questions involved.  If an opinion has been reported, that fact and the appropriate citation shall also be set forth.

**(c)      Pleadings.-**When pursuant to Rule 2151(c) (original hearing cases) the parties are not required to reproduce the record, and the questions presented involve an issue raised by the pleadings, a copy of the relevant pleadings in the case shall be appended to the brief.

> **(d)** **Brief of the Appellant.-**In the Superior Court, there shall be appended to the brief of the appellant a copy of the statement of errors complained of on appeal, filed with the trial court pursuant to Pa.R.A.P. 1925(b). If the trial court has not entered an order directing the filing of such a statement, the brief shall contain an averment that no order to file a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) was entered by the trial court.

Rules 2114 through 2119 establish and set forth in great detail the specifics as to each of the required sections of the brief. **See** Pa.R.A.P. 2114-2119. Rule 2101 provides as follows with regard to non-compliance:

> Briefs and reproduced records shall conform in all material respects with the requirements of these rules as nearly as the circumstances of the particular case will admit, otherwise they may be suppressed, and, if the defects are in the brief or reproduced record of the appellant and are substantial, the appeal or other matter may be quashed or dismissed.

Pa.R.A.P. 2101.

We have held that an appeal may be dismissed and/or quashed where the deficiencies of the appellant's brief are such that we are unable to conduct a meaningful review. **Karn v. Quick & Reilly, Incorp.**, 912 A.2d 329, 337 (Pa.Super. 2006); **Branch Banking & Trust v. Gesiorski**, 904 A.2d 939, 943 (Pa.Super. 2006); **Commonwealth v. Maris**, 629 A.2d 1014, 1017 (Pa.Super. 1993). Of particular importance, an appellant must include a Statement of Questions Involved. **Branch Banking & Trust**, 904 A.2d at 94; **Maris**, 629 A.2d at 1016. As we indicated in **Maris**:

> "This Court possesses discretionary authority to quash, dismiss or deny allowance of appeal based upon the

substantial defects of appellant's brief. Pa.R.A.P. 2101."
***Commonwealth v. Ely***, [] 554 A.2d 118, 119
([Pa.Super.]1989). . . . "We decline to become appellant's
counsel. When issues are not properly raised and
developed in briefs, when the briefs are wholly inadequate
to present specific issues for review a [c]ourt will not
consider the merits thereof." ***Sanford***, [] 445 A.2d [149,
150 (Pa.Super. 1982)]. . . .

***Maris***, 629 A.2d at 1017. Significantly, a failure to preserve issues by raising them in **both** the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues. ***Krebs v. United Refining Co. of Pennsylvania***, 893 A.2d 776, 797 (Pa.Super. 2006) ("We will not ordinarily consider any issue if it has not been set forth in or suggested by an appellate brief's statement of questions involved, and any issue not raised in a statement of matters complained of on appeal is deemed waived.") (citations omitted).

Likewise, "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." ***In re W.H.***, 25 A.3d 330, 339 n.3 (Pa.Super. 2011), *appeal denied*, 611 Pa. 643, 24 A.3d 364 (2011) (quoting ***In re A.C.***, 991 A.2d 884, 897 (Pa.Super. 2010)); ***see also*** Pa.R.A.P. 2119(a) (stating, "The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—

the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.").

Lastly, "issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Pursuant to Pa.R.A.P. 2117(c) and 2119 (c) and (f), the brief must provide an indication in the record where such issues were raised below.

We find that Mother has waived all issues on appeal. In her concise statement, Mother raised trial court error related to the exclusion of the testimony of medical and other witnesses as to Child's health status before and after his visit with Father. Concise Statement of Errors Complained of on Appeal, 3/23/17. However, Mother failed to raise these issues in the statement of questions involved section of her brief as she failed to include such a section in her brief.[9] Further, to the extent an issue can be deciphered from her argument in her brief, Mother essentially maintained her lack of responsibility for Child's injuries.[10] Mother's Brief at 8-11. She abandoned any reference to the claims of the trial court's failure to allow

---

[9] We observe that the table of contents of Mother's Brief does, however, reference a statement of questions involved. Mother's Brief at 1 (unpaginated).

[10] While Mother sets forth the relevant law as to Section 2511 regarding the statutory grounds for termination of parental rights, as taken from the trial court's opinion, Mother provides limited analysis, if any, in order to adequately develop any such claims related thereto. Mother's Brief at 8-11 (unpaginated).

medical and other testimony related to Child's physical condition before and after his visit with Father. Mother, thus, failed to preserve a challenge related to her initial claims by failing to additionally raise these issues in a statement of questions involved section of her brief, and by failing to present argument related thereto in her brief. She, likewise, failed to preserve a challenge related to the claims raised in her argument by failing to include these in her concise statement as well as a statement of questions involved. As such, we find that Mother has waived such claims. *See Krebs*, 893 A.2d at 797; *In re W.H.*, 25 A.3d at 339 n.3.

Moreover, DHS and Child additionally argue that Mother's challenge to the causation of Child's injuries is precluded by the doctrine of collateral estoppel and/or *res judicata*. DHS's Brief at 11-12; Child's Brief at 15. In so doing, DHS and Child point to the fact that the trial court already made a finding of abuse and aggravated circumstances.

> On appeal, Mother claims that she "had nothing to do with the Child's three skull fractures that ultimately led to the termination of her parental rights. In making this argument Mother ignores that upon the adjudication of dependency, the trial court entered an order that was not appealed or otherwise challenged and which found that "[t]he Child . . . has been the victim of physical abuse resulting in serious bodily injury . . . proven as to Mother . . .[.]" Because of the earlier finding that Mother [sic] in the dependency proceeding that Mother was the perpetrator of the physical abuse against the Child, Mother is collaterally estopped from challenging that finding in this matter.

DHS's Brief at 11.

The "doctrines [of *res judicata* and collateral estoppel] serve to preclude the litigation, respectively, of claims and issues that have previously been litigated." ***Chada v. Chada***, 756 A.2d 39, 42 (Pa.Super. 2000). Generally, *res judicata* will bar any future suit on the same cause of action between the same parties where a final judgment has been rendered. ***Id***. For the doctrine to apply, the former and latter suits must possess the following common elements: "(1) identity in the thing sued upon; (2) identity in the cause of action; (3) identity of persons and parties to the action; and (4) identity of the capacity of the parties suing or being sued." ***Id***.

> Collateral estoppel applies when:
>
> (1) the issue decided in the prior case is identical to one presented in the later case; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding and (5) the determination in the prior proceeding was essential to the judgment.

***Id***. Generally, collateral estoppel bars issues that were already litigated in prior proceedings, while *res judicata* bars subsequent claims that *could* have been litigated in prior actions. ***Id***.

Here, the court litigated the issue of Child's injuries and/or abuse and causation in the context of the dependency matter on November 28, 2016. Further, after hearing the evidence, the court entered a finding of abuse and aggravated circumstances, with Mother as a perpetrator, at the

adjudicatory/aggravated circumstances hearing on November 28, 2016. *See* Order of Adjudication and Disposition – Child Dependent, 11/28/16; Aggravated Circumstances Order, 11/28/16. Mother participated in and was represented by counsel during these proceedings. Subsequent to the entry of these findings, Mother failed to appeal. *See* DHS Exhibit 1. Mother would, therefore, be collaterally estopped from challenging the issue of Child's injuries and/or abuse and her related responsibility in the involuntary termination proceedings. Notwithstanding, had Mother appropriately raised and preserved a challenge as to the statutory grounds for termination of her parental rights, as well as the goal change, we would find such claims without merit.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id*. "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*. The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id*. at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct,

weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting ***Matter of Adoption of Charles E.D.M., II***, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b)[11]. We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). ***In re B.L.W.,*** 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc)*. We, therefore, analyze the court's decision to terminate under Sections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

---

[11] We disagree with the trial court as to the application of 23 Pa.C.S.A. § 2511(a)(8) as Child had not been removed from Mother's care for a period of twelve months. 23 Pa.C.S.A. § 2511(a)(8) (requiring, in part, that "12 months or more have elapsed from the date of removal or placement").

. . .

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), and (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)). Nevertheless, parents are required to make diligent efforts towards

- 17 -

the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.*, 797 A.2d at 340. A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id*.

Further, in *In re A.D.*, 93 A.3d 888, 896–97 (Pa.Super. 2014), we analogized a no-contact order to imprisonment and held that such an order created parental incapacity. In so holding, this Court stated as follows:

> Just as our Supreme Court discussed a parent's incapacity relative to long-term incarceration in *In re Adoption of S.P.*, [616 Pa. 309, 47 A.3d 817 (2012)], parental incapacity caused by a no-contact order is not only relevant to a court's conclusion that grounds for termination exist under § 2511(a)(2), but where, as here, the order is required to protect the children from further sexual abuse at the hands of the excluded parent, we find that it is dispositive.
>
> Father's repeated behaviors and his failure to be present for his children due to the no-contact order has caused the children to be without essential parental care, control, or subsistence necessary for their physical and mental well-being. Notwithstanding Father's moderate compliance with the few requirements CYS established for him, the conditions and causes of his parenting incapacity cannot be remedied as long as the no-contact order remains in place. We agree with the court's refusal to put on hold the need for consistent parental care and stability of K.R.D., A.D., and C.D. simply because Father must abide by the no-contact order that was entered for their safety. Thus, we reject Father's premise that the trial court erred in terminating his parental rights based upon his inability to remedy his parental incapacity.

*Id.* at 897.

In the instant matter, in finding grounds for termination pursuant to Section 2511(a)(2), the trial court reasoned,

So[,] because the [c]ourt is clear that reunification is not a viable option[,] because I could not safely return the child to the care of any parent because I cannot ascertain exactly who inflected [sic] the injury[,] and[,] based on my previous findings[,] I find with clear and convincing evidence that the right of [M]other [] as to this child [] . . . should be involuntarily terminated pursuant to 2511[(a)(2)].

N.T. at 57-58. The court further expounded in its Rule 1925(a) opinion, stating,

As of the February 23, 2017[] hearing, J.J.B. had been in care for six (6) months. As a result of the Aggravated Circumstance[s] hearing detailing the physical abuse of J.J.B. by Mother, the [c]ourt suspended visitation with Mother. Moreover, the [c]ourt found the physical abuse, medical neglect, or refusal of parent caused the child to be without essential parental care.

T.C.O. at 4 (citations to record omitted).

A review of the record supports the trial court's determination of a basis for termination under Section 2511(a)(2). The record reveals that Child suffered three skull fractures, as well as a hematoma with bleeding, without explanation. N.T. at 20; *see also* DHS Exhibit 3, 11/28/16. Child's injuries were determined not to be accidental, but inflicted. *Id*. In addition, Mother delayed seeking care for Child for two days, despite acknowledging symptoms.[12] *Id.* at 22, 55. As a result, in order to protect Child, Mother's visitation with Child was suspended. *Id.* at 20; *see also* Shelter Care

---

[12] Mother acknowledged a lump on the back of Child's head, which swelled. She additionally noted fatigue and marks and/or bruising around the bridge of Child's nose and eyes. Petition for Involuntary Termination of Parental Rights, 12/22/16, at Exhibit "A", Statement of Facts re: [Child], ¶¶ a, c.

Order, 8/26/16. The court additionally issued findings of abuse and aggravated circumstances. Order of Adjudication and Disposition – Child Dependent, 11/28/16; Aggravated Circumstances Order, 11/28/16; N.T. at 20. Notably, Mother was found to be a perpetrator of abuse. *Id*.

As summarized by the trial court,

. . .[T]he information within the Shelter Care Hearing is that I had an infant that presented to St. Christopher's with three skull factures, bi-lateral fractures across the parallel [sic] zone and a frontal bone fracture in the forehead region, also a hematoma with acute bleeding. And neither parent can give plausible explanation as to why that happened.

Dr. McColgan testified exhaustively at the last hearing, which I believe was the Adjudicatory Hearing on November 28th, that the injuries sustained to this child were not accidental in nature, but were intentional.

So with that in mind[,] in an abundance of caution because we are here to ensure the safety of the children, with no plausible explanation[,] the [c]ourt would not even allow supervised visits based on that. And, in the previous hearing[,] I was kind of concerned about the demeanor of the parent[s] as well. So that, coupled with the fact that the adjudicatory was also an Aggravated Circumstances Hearing in which the Court found, yes, there was a find[ing] of child abuse and aggravated circumstances.

N.T. at 20. The court further recounted,

There was some testimony at that time about mom didn't notice symptoms and mom might have delayed getting the child to a physician right away. So, I understand what [counsel for Mother] has indicated that there was no health center opened on Saturday or Sunday[,] but there's always [sic] emergency room that [sic] open 24/7. And in such a small child[,] when you notice swelling and a lump on the head and the baby wasn't responding as the baby usually does, which was the testimony, surely mom should have made every effort to get the baby emergency care. That did not happen.

N.T. at 54-55.

Hence, the record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for his physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. *See id*. As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). *In re B.L.W.*, 843 A.2d at 384.

We next determine whether termination was proper under Section 2511(b). Our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]*, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's

- 21 -

"needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628-29, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In the case *sub judice*, in determining that termination of Mother's parental rights favors Child's needs and welfare under Section 2511(b) of the Adoption Act, the trial court stated,

> 2511[(b)] consideration have [sic] been taken in [sic] by the [c]ourt. Ms. Thomas testified that the child is very bonded and attached to the current caregiver who's a pre[-]adoptive resource. Parents have had no contact so, therefore, there's no irreparable harm, no detrimental harm in doing so. And the testimony was that there was no negative effects in not having visitation of the parents.
>
> So[,] with that in mind, I do find that it's in the best interest of [Child] to be adopted.

N.T. at 57-58. In its Rule 1925(a) opinion, the trial court elaborated as follows:

> In order to terminate the parental rights, the party seeking termination must prove by clear and convincing evidence that the termination is in the best interest of the child. The best interest of the child is determined after consideration of the needs and welfare of the child. The trial court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of this [sic] parental rights to determine if the evidence, in light of the totality of the circumstances, clearly warrant [sic] involuntary termination.
>
> In the instant matter, on November 28, 2016 the [c]ourt found clear and convincing evidence was presented and established [a]ggravated [c]ircumstances and child abuse of J.J.B. existed as to the [m]other and [f]ather. The [c]ourt found no reasonable efforts on part of the DHS to reunify J.J.B. During this proceeding, the [c]ourt was concerned parents failed to exercise their right to make independent efforts towards reunification and Mother failed to do so.
>
> When determining the best interest of the child, many factors are to be analyzed, "such as love, comfort, security, security and

stability.  Another factor that a court is to consider is what, if any, bond exist for the child.

Pursuant to Section 2511(b), the trial court must take account whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.  In the instant matter, the testimony established that the child, J.J.B., would not suffer any irreparable emotional harm if [M]other's parental rights were terminated.  [T]he social worker testified J.J.B. had not had any visitation pursuant to suspension of visits by the [c]ourt.  Furthermore, the social worker testified J.J.B. has been with the foster parent the majority of his life.  J.J.B. is very bonded with his foster parent.  Testimony established there is a parent/child bond between J.J.B. and his foster parent which did not exist between the child and his mother.

The [c]ourt stated concern about reunification as a viable option due to the [c]ourt's safety concerns and failure to ascertain how injury was inflicted on J.J.B.[]  The [c]ourt found convincing the testimony that J.J.B. suffered no negative effects in not having visitation with his parents.  Hence, the [c]ourt concluded the child would not suffer irreparable harm.

T.C.O. at 5 (citations including citations to record omitted).

Upon review, the record supports the trial court's finding that the Child's developmental, physical and emotional needs and welfare favor termination of Mother's parental rights pursuant to Section 2511(b).  There was sufficient evidence to allow the trial court to make a determination of the Child's needs and welfare, and as to the lack of a bond between Mother and Child that, if severed, would not have a detrimental impact on him.

Visitation between Mother and Child remained suspended since Child came into care at six weeks old.  N.T. at 16; **see also** Shelter Care Order, 8/26/16; Order of Adjudication and Disposition – Child Dependent, 11/28/16.  Significantly, CUA case manager, Telita Thomas, reported a lack

of negative impact on Child as a result of the suspended visitation. *Id*. Conversely, Ms. Thomas observed the existence of a strong bond between Child and foster mother, *id.* at 14. Child had been placed with foster mother, who is "willing to provide permanency," for a majority of his young life. *Id.* at 14, 17. Ms. Thomas testified that she "doesn't believe Child can safely reunify with either parent." *Id.* at 15. She further opined that termination of parental rights would not harm Child and that it is in the best interest of Child to be free for adoption. *Id.* at 16. Thus, we discern no abuse of discretion and, as confirmed by the record, termination pursuant to Section 2511(b) was proper.

While Mother may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Lastly, we turn to the question of whether the trial court appropriately changed the permanency goal to adoption. In so doing, our standard of review is the same abuse of discretion standard as noted above. *See In*

*the Interest of L.Z.*, 631 Pa. 343, 361, 111 A.3d 1164, 1174 (2015) (citing

*In re R.J.T.*, 608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)), for the

proposition that the abuse of discretion standard applies in a dependency

matter; *see also In re S.B.*, 943 A.2d 973, 977 (Pa.Super. 2008) ("In

cases involving a court's order changing the placement goal from "return

home" to adoption, our standard of review is abuse of discretion.")

> Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months.  The best interests of the child, and not the interests of the parent, must guide the trial court.  As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa.Super. 2011) (citations and

quotation marks omitted).

Additionally, Section 6351(f.1) requires the trial court to make a

determination regarding the child's placement goal:

> **(f.1) Additional determination.—**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> . . .

> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f.1).

Upon review of the record, a challenge to the goal change lacks merit. The record reveals that a change of the permanency goal to adoption was in Child's best interests. Mother was found to be a perpetrator of abuse as to Child, whose injuries remained unexplained. Order of Adjudication and Disposition – Child Dependent, 11/28/16; Aggravated Circumstances Order, 11/28/16; N.T. at 20. As a result, visitation between Mother and Child remained suspended. Order of Adjudication and Disposition – Child Dependent, 11/28/16. Child had resided with foster mother almost his entire young life and, as such, was bonded with foster mother, not Mother. N.T. at 14, 17. Therefore, the record supports that a goal change was in the best interests of Child. Accordingly, after review of the record, we again discern no abuse of discretion, and conclude that the trial court properly changed Child's permanency goal to adoption.

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b) and changed Child's permanency goal to adoption.

Decree and order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/5/2017